HOOD, Judge.
Acadiana Properties, Inc., seeks to recover amounts alleged to be due under seven fire and extended coverage insurance policies issued to it by defendants, as the result of the collapse of a part of the front wall of a two story brick building owned by plaintiff. The defendants are: Peninsular Fire Insurance Company; Central Mutual Insurance Company; Gulf Insurance Company; Pennsylvania Millers Insurance Company; Continental Insurance Company; St. Paul Fire and Marine Insurance; and Employers Commercial Union Insurance Company. Judgment was rendered by the trial court in favor of defendants. Plaintiff appealed.
*87 The issues presented are (1) whether a windstorm occurred in the City of Crowley on April 17 or 18, 1973, and (2) whether the collapse of a part of the front wall of plaintiff’s building was caused by the direct action of wind.
Plaintiff is the owner of a two story brick building located on the west side of one of the principal business streets in the City of Crowley. It has owned that building for at least 12 years, and during all of that time the building has been leased to and occupied by Nichols, Inc., for the operation of a clothing store.. The building is relatively old, having been built in 1900. Its exterior walls are constructed of brick, while the interior walls are made of wood.
Shortly after 1:00 P.M. on April 18, 1973, the top six or eight feet of the front or east brick wall of the building collapsed and fell to the ground. The weight of the falling bricks destroyed a sidewalk canopy, smashed display windows and caused other damages. The damages have been repaired, and the parties have stipulated as to the expenses which were incurred in making those repairs.
The building was about 60 feet wide and from 120 to 160 feet long. It had a 5-ply, hot mopped, built up roof, which was at least 16 years old. The roof sloped from the front to the rear of the building, the elevation of the roof at the front being two to three feet higher than the elevation at the rear. The slope was designed to facilitate drainage, and the evidence shows that the grade was adequate to prevent water from standing on the roof. Several scuppers were located in the back parapet to allow water to run off the roof.
The brick walls on all four sides of the building extended above the roof, the east or front wall extending about three feet above the part of the roof which abutted that wall. The east wall, which was about 16 inches thick, was not a bearing wall, it obviously having been constructed for decorative purposes, forming a sort of facade for the building. The outside of that wall was exposed masonry, while the inside or back of it was coated with the same type membrane as that which was on the roof. The roof and the backside of the east facade were covered with several layers of roofing felt, which formed a continuous membrane covering the roof and extending up the backside and to the top of the east wall.
The building was examined by experts shortly after the top part of the front wall collapsed, and they determined (1) that the part of the wall which fell had not been “tied” to the inner wall of the building as it should have been, (2) that the mortar used in constructing the wall was “lime mortar,” which had deteriorated to the point where it had become “dead” or “cheesy,” and that the mortar crumbled easily and did not adhere to the bricks, (3) that at some time prior to the collapse of the wall the roofing membrane had broken or cracked along the line where the roof joined the front parapet, and (4) that water had seeped through the crack in the roofing membrane to the wood structure supporting the roof and to the lime mortar which had been used in constructing the front brick wall.
The experts explained that “lime mortar” becomes “dead” or “cheesy” when it is exposed to water, and that when that occurs the mortar crumbles easily and does not adhere to the bricks. That type of mortar has become obsolete and is no longer used in construction work.
The policies issued by defendants in this case insure plaintiff against direct loss of the above building by windstorm. Each policy contains the following pertinent provision :
“This Company shall not be liable for loss to the interior of the building(s) or the property covered therein caused: (a) by rain, snow, sand or dust, whether driven by wind or not, unless the building(s) covered or containing the proper *88 ty covered shall first sustain an actual damage to roof or walls by the direct action of wind or hail and then shall be liable for loss to the interior of the building(s) or the property covered therein as may be caused by rain, snow, sand or dust entering the building(s) through openings in the roof or walls made by direct action of wind or hail; or (b) by water from sprinkler equipment or from other piping, unless such equipment or piping be damaged as a direct result of wind or hail.” (Emphasis added).
It is apparent from the above provision contained in each policy that plaintiff cannot recover in this action unless it establishes that the insured building sustained an actual damage to the roof or walls “by the direct action of wind.”
The evidence shows that the weather in Crowley was clear and calm and that there were no high winds in or near that city on April 18, 1973, the day on which the wall of this building collapsed. There was a heavy rainfall in Crowley on April 17, the day before the wall fell, however, and the record shows that some high winds and two tornadoes occurred a few miles south of the city limits on that day. There were no significant winds or windstorms within the city itself, however, either on the day the wall collapsed or on the previous day.
Mrs. Mary Cole, who lives about six miles south of Crowley, testified that when she returned to her home from Crowley on the afternoon of April 17, she found that the weather was bad and that her tin garage had been blown down and her pump shed had been moved by high winds. She, however, found no damage to her garden, to her telephone lines or to any other buildings in that vicinity. Joseph L. Hains, who lives about two miles south of Crowley, testified that his garage also was blown down by high winds on April 17. His garage was located about 30 feet from his home, and he stated that the winds did not disturb his telephone lines and did not damage even the shingles on his house. The Crowley newspaper reported that a tornado dipped down at points south of Crowley on April 17, and we think the evidence supports that observation. The evidence is equally convincing, however, that there were no high winds or tornadoes of any kind within the city limits of Crowley on that day.
The trial court found that plaintiff had , failed to prove the occurrence of a windstorm in the City of Crowley on April 17 or 18, 1973, and on the basis of that finding he rendered judgment in favor of defendants, rejecting plaintiff’s demands. We agree with the trial court that the evidence fails to show that a windstorm occurred in the City of Crowley on either of those days.
Plaintiff contends, however, that the evidence nevertheless establishes that the most probable cause of the damage was the wind. It argues that the wind, at some time in the past, had caused the front wall of the building to move slightly forward, that that in turn had caused the roof membrane to crack along the line where the roof joined the front parapet, and that water thereafter seeped through the crack in the roofing felt to the wood which supported the roof and to the mortar which had been used in constructing the wall. It takes the position that the water which seeped through the above crack caused the lime mortar to deteriorate and the wood to swell, and that the swelling of the wood pushed the wall forward beyond its center of gravity and caused it to fall. Plaintiff argues, therefore, that the collapse of the wall is attributable to wind damage at some time in the past.
Robert E. Barras, an architect called by plaintiff, examined the building within an hour after the wall collapsed. Jesse A. Stafford, Jr., a construction superintendent called by defendants, examined the building a little later that afternoon. Both of these witnesses were qualified as experts, and both agreed that some time prior to *89 the collapse of the wall the membrane which covered the roof had cracked along the line where the roof abutted the front parapet. They felt that water had seeped through that crack to the wood and to the lime mortar in the front brick wall, causing the wood to swell and the lime mortar to deteriorate. These experts agreed that the expansion of the wood pushed the wall forward, and that this pressure, combined with the weakened condition of the wall and the fact that it was not tied to the wood framework of the building, caused the wall to collapse when it reached the point where it was off balance.
Both of these experts also agreed that the roof was old, and that roofing membranes of that type deteriorate with age, wear, heat and weather conditions, and that in time the membrane cracks. They stated that the most likely place for a roofing membrane to crack is in a place where it is bent, such as the place where the roof on plaintiff’s building had cracked. They were unable to speculate as to how long the crack had existed in the roof of the building involved here before the wall collapsed, but they stated that it could have occurred one day or several weeks before the damage was done.
Barras felt that the crack in the roofing membrane had been caused by the wind. He" expressed the view that a “previous wind” had pushed the brick wall slightly and had caused the roof membrane to crack. His testimony, in part, is that:
“. . . . And my opinion is that a previous wind had pushed this wall some, in order to break this membrane, and the water getting in on the ends of these board, perhaps extending them a little bit, perhaps doing some damage to some inferior mortar, may have been contributory. But my feeling is that the initial force of the wind, at some previous time, is what was the primary cause of all of this taking place.”
Barras conceded that a “soil change” or the weakened mortar alone could also have caused the wall to move and the roof membrane to be broken. He admitted that if a wind had caused the wall to move enough to crack the roof membrane on April 17, the wall probably would have fallen on that date rather than on April 18. He knew that there had been no significant wind in Crowley on April 18, and he was unable to testify as to when the roof leak occurred or whether it occurred during a windstorm in that area. We think his conclusion that the collapse of the wall could be attributed to wind damage is based on speculation which is not supported by the evidence.
Stafford attributed the crack in the roof membrane to the age of the roof, to wear and to weather conditions. He stated, for instance, that:
“. . . .it was a ten-year-or-better aged roof, and after fifteen, eighteen, twenty years, the roof, it needs a new roof on it; and this is weather beat, this is weather beat. It could be water-holding.
“. . . . Now contraction- or expansion can cause this roof to either age, well, have something to do with it; sun would crack it, cold weather would cause it to crack or some — ”
His opinion as to the cause of the damage to the building is summed up by the following part of his testimony:
“I’d say the flashing accumulated the leak and from that leak the water got back into the brickwork, got back into the wood, and caused the brick, the mortar inbetween the brick to eat away some more causing a weakness there; and then the wetting, getting the lumber wet —which is the decking, the trusses— causing an expansion, causing the truss to expand, centermatch to expand. That caused the pressure to be put on the walls.”
*90 Plaintiff alleges in its petition that the collapse of the wall of the building was caused solely by “sustained extensive windstorm damage during the unusually turbulent weather” which occurred on or about April 18, 1973. The trial judge found, and we agree, that no windstorm or turbulent weather occurred in Crowley on or about the above date. Plaintiff thus has failed to establish that the building was damaged by the “direct action of wind” on that date.
We conclude that the evidence also fails to show that the collapse of the wall was caused by a “previous wind” or by a wind which occurred “at some previous time,” as surmised by Barras and argued by plaintiff.
This was an extremely heavy wall, and we assume that a relatively strong wind would be required to move it. The evidence shows that it was in a weakened condition and that it was not tied to the framework of the building at the time it collapsed. We believe that if the wall had been forced by wind pressure to move enough to tear the roofing membrane, as contended by plaintiff, the weakened and unsecured wall would have collapsed at the time it was subjected to that pressure. It it improbable, we think, that the wall would remain standing after being subjected to such strong winds, and then collapse on a clear, calm day. It is more probable that the crack in the roofing membrane was caused by the age of the roof, and by heat, wear and weather conditions, rather than by windstorm.
Our conclusion is that the evidence fails to establish that the loss sustained by plaintiff was caused by the direct action of wind. We thus find no error in the judgment rendered by the trial court.
The judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellent.
Affirmed.